IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KROGER CO., and THE KROGER
CO. OF MICHIGAN,
        Plaintiffs,

v.                                                       Civil Action No. 3:17-cv-480-JAG

LIDL US, LLC, and LIDL STIFTUNG
& CO. KG,
        Defendants.

## OPINION

The Kroger Co. and The Kroger Co. of Michigan (collectively, "Kroger") bring this unfair competition action against the defendants, Lidl US, LLC, and Lidl Stiftung & Co. KG (collectively, "Lidl"). Kroger has moved the Court to preliminarily enjoin Lidl from using its "PREFERRED SELECTION" word mark or logo ("Preferred Selection") on its grocery products because consumers will likely confuse it with Kroger's "PRIVATE SELECTION" mark or logo ("Private Selection"). Lidl claims that its mark does not infringe on Kroger's mark and that, in any event, Kroger has not made a clear showing of trademark infringement at the preliminary injunction stage. The Court denies Kroger's motion for a preliminary injunction because Kroger has not made a clear showing that it will succeed on the merits or that it will likely suffer irreparable harm in the absence of an injunction.

## I. BACKGROUND

The Court finds the following facts. Kroger, one of the largest grocery retailers in the world with $115 billion in sales in 2016, has used the Private Selection trademark for its premium-tier store-brand products for over twenty years. Kroger owns six federal trademark registrations for the Private Selection marks. Four of Kroger's six registrations have

incontestable validity because Kroger registered the marks and used them for five years. Besides Kroger-named stores, Kroger operates 24 other chains of grocery stores throughout the United States under other names, including Ralph's and Harris Teeter. Most of these other stores carry Private Selection products.

Lidl, a German grocery company, filed an "Intent-To-Use" trademark application with the U.S. Patent and Trademark Office (the "PTO") to register Preferred Selection on September 19, 2016. Upon learning of this application, Kroger's in-house counsel contacted Lidl's in-house counsel opposing the registration. Kroger later filed an opposition to Lidl's intent-to use application before the Trademark Trial and Appeal Board. On June 15, 2017, Lidl entered the U.S. market, opening nine stores and selling its premium store-brand products using the Preferred Selection mark. Lidl plans to open 100 stores in the U.S. within the next year.

Kroger's Private Selection mark contains a four-leaf clover border and small flourishes which resemble flowers. Lidl's Preferred Selection mark has a more ornate border and, on most of its products, has a colored flag reflecting the product's country of origin. A majority of Lidl's Preferred Selection products have colorful packaging, whereas Kroger's packages contain generally muted colors with its Private Selection logo on a dark background. Lidl's Preferred Selection products indicate on the back of the packaging that the products come from Lidl, and Kroger's Private Selection products do the same.

In 2016, Kroger sold about $2 billion worth of Private Selection products to over 25 million U.S. households. A survey by Professor Isabella Cunningham shows that 54% of frequent Kroger shoppers recognize the Private Selection mark as coming from a single source, with 58% of those shoppers identifying the source as Kroger. Only 13% of infrequent Kroger shoppers or non-Kroger shoppers associate Private Selection with a single source. Before asking

respondents whether the Private Selection logo comes from a particular source, Professor Cunningham's survey referred to the image as a "logo," which may have led to bias in Kroger's favor by pre-identifying the Private Selection mark as a logo associated with a brand.

Kroger-brand stores generally have 30,000 square feet of space with over twenty aisles and tens of thousands of individual barcodes identifying different products (known as "SKUs"). Kroger's family of brands includes some stores with smaller footprints and product offerings. Lidl's U.S. stores all have the same footprint, with six aisles and around 3000 SKUs. Both parties advertise their premium store brands via mailings, coupons, and internet advertising. Lidl seeks to distinguish itself from other U.S. grocery stores with its small footprint, modern stores, and by providing 90% of its offerings from its own private-label goods.

Each party conducted a survey on actual confusion between the Preferred Selection mark and Kroger's mark. For Kroger, Professor Cunningham conducted a "Squirt" survey in which she showed survey takers Kroger's Private Selection mark and Lidl's Preferred Selection mark. Cunningham's survey did not show any other brand's trademarks, and displayed the two marks within 20 seconds of one another without any intervening questions. Kroger's survey claims to show a 25% rate of confusion between Kroger's Private Selection mark and Lidl's Preferred Selection mark. For Lidl, Dr. Deborah Jay conducted an "Eveready" survey which showed survey takers only Lidl's Preferred Selection products (containing the Preferred Selection mark on their packaging) and then asked open-ended questions about whether the respondents associated the products with any particular brand(s). Dr. Jay's survey shows a 2% rate of confusion.

Kroger believes that Lidl purposely targeted its mark to take advantage of the customer familiarity and brand loyalty Kroger's mark has earned.

## II. STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345–47 (4th Cir. 2009), *vacated on other grounds* 559 U.S. 1089 (2010). A preliminary injunction is an extraordinary remedy and the plaintiff "must demonstrate [these factors] by 'a clear showing.'" *Id.* at 345 (citation omitted).

## III. DISCUSSION

Although Kroger brings five claims against Lidl, it asserts only two of its counts in support of its motion for a preliminary injunction: trademark infringement and dilution. Kroger fails to show a likelihood of success on the merits for either of its asserted claims, and the other *Winter* factors weigh against a preliminary injunction.

### A. *Trademark Infringement*

The ultimate question, for purposes of determining liability in trademark infringement actions, is "whether there exists a 'likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply confused, as to the source of the goods in question.'" *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 127 (4th Cir. 1990) (citations omitted). To prevail on a trademark infringement claim under the Lanham Act, "the trademark holder must prove: (1) that it possesses a mark; (2) that the [opposing party] used the mark; (3) that the [opposing party's] use of the mark occurred 'in commerce'; (4) that the [opposing party] used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or

services; and (5) that the [opposing party] used the mark in a manner likely to confuse consumers." *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005).[1] The parties stipulated to the first four factors, so the Court addresses only the last factor: whether Lidl uses its mark in a manner likely to confuse consumers.

A balance of the following nine factors determines the likelihood of confusion to consumers: (1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods and services that the marks identify; (4) the similarity of the facilities that the two parties use in their business; (5) the similarity of the advertising the two parties use; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. *Pizzeria Uno v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984); *Sara Lee v. Kayser-Roth*, 81 F.3d 455, 463–64 (4th Cir. 1996). The factors are not of equal importance and are not always relevant in a particular case. *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992) (noting that the *Pizzeria Uno* factors are not meant to be a rigid formula, but simply a guide or list of various considerations that may be relevant in determining likelihood of confusion).

Reviewing these nine factors, the court finds that Kroger has not made a clear showing of likelihood of confusion.

### i. *Strength or descriptiveness of the mark*

Courts consider the strength or descriptiveness of a mark "paramount" in the likelihood of confusion analysis. *Pizzeria Uno*, 747 F.2d at 1527. A mark's strength consists of both its conceptual strength and its commercial strength. Courts determine a mark's conceptual strength

---

[1] Citing *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) (citing 15 U.S.C. §§ 1114, 1125; *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995)).

by placing the mark into one of four groups in an ascending level of descriptiveness: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393–94 (4th Cir. 2009). Generic marks cannot receive trademark registration with the PTO, and descriptive marks qualify for registration only if they have developed a secondary meaning. *Id.* at 394. "[S]econdary meaning is shorthand for saying that a descriptive mark has become sufficiently distinctive to establish a mental association in buyers' minds between the alleged mark and a single source of the product." *Id.* Suggestive marks are more distinct than descriptive ones, and arbitrary or fanciful marks have the highest distinctiveness and therefore receive the greatest level of trademark protection.[2] *Id.*

After a court has decided whether the mark is suggestive or descriptive, it must still determine the mark's commercial strength. Even a suggestive mark may be found commercially weak because the "strength of a mark ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source." *Id.* at 396 (finding a suggestive mark weak where the record lacked evidence demonstrating that consumers associate the mark with the mark holder). The commercial strength of a mark "entails a rigorous evidentiary standard" that considers six factors: (1) the plaintiff's advertising expenditures; (2) consumer

---

[2] To determine whether a mark is suggestive or descriptive, a court does not look at the mark in a vacuum, but to how the "mark is used in connection with" the products or services it represents. "Suggestive marks . . . do not describe a product's features but merely suggest them. In other words, the exercise of some imagination is required to associate a suggestive mark with the product. Examples of suggestive marks are 'Coppertone®, Orange Crush®, and Playboy®.' Descriptive marks define a particular characteristic of the product in a way that does not require any exercise of the imagination. Examples of descriptive marks include 'After Tan post-tanning lotion' and '5 Minute glue.'" *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 394 (4th Cir. 2009) (internal citations omitted). The PTO's determination of whether a mark is descriptive or suggestive serves as *prima facie* evidence of whether a mark is descriptive or suggestive, but the parties here have not provided evidence about whether the PTO granted Kroger's Private Selection marks without requiring evidence of secondary meaning. *George & Co. LLC*, 575 F.3d at 394.

studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark. *Id.* at 395 (citations omitted). Commercial strength tests whether "a substantial number of present or prospective customers" associate the mark with a source. *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006).

Overall, Kroger's evidence on Private Selection's strength weighs against a preliminary injunction. Even assuming the Private Selection mark has suggestive distinctiveness,[3] Kroger has failed to make a clear showing of Private Selection's commercial strength. Kroger has not submitted evidence of its advertising expenditures related to Private Selection or shown any attempts to plagiarize the mark outside of the allegations in this case. Next, although Private Selection products generated $2 billion in sales last year, these sales account for less than 2% of Kroger's overall sales of $115 billion. Taken in context, the large volume of Private Selection sales does not weigh strongly in favor of the Private Selection's overall commercial strength because it accounts for a relatively small percentage of Kroger's sales. Most significantly, Kroger fails to clearly show that consumers actually link Private Selection with a particular source. Professor Cunningham concludes that 54% of the public identifies Private Selection with a single source, but her calculation includes only those persons who perform at least half of the grocery shopping in their household, have shopped at Kroger in the past month, and plan to shop at Kroger in the upcoming month. By eliminating all other consumers, Cunningham's survey fails to make a clear showing that prospective customers, rather than current customers, link the Preferred Selection mark to a source. For example, Lidl shows that only 13% of infrequent

---

[3] The Court reserves ruling on Private Selection's ultimate conceptual strength at this time.

grocery shoppers or infrequent Kroger shoppers associate the mark with a source. Lidl also points to potential bias in Professor Cunningham's survey which further weakens the probative value of her conclusions on commercial strength.

Kroger has admitted that this case will turn, in large part, on a battle of experts. Both sides presented expert testimony at the hearing on the preliminary injunction, and the experts are in absolute conflict as to the strength of Kroger's trademark, and the likelihood of confusion among consumers.

In short, Kroger's evidence of Private Selection's strength fails to clearly show a likelihood of confusion claim, which cuts against its likelihood of success on the merits.

### ii. *The similarity of the two marks*

Courts judge similarity by the sound, appearance, and meaning of the two marks. *Pizzeria Uno*, 747 F.2d at 1534-35. A court "must examine [the mark] in the context in which it is seen by the ordinary consumer," and differences in public presentation can cut against textual similarity. *CareFirst*, 434 F.3d at 271-72 (quoting *Anheuser-Busch, Inc.*, 962 F.2d at 319).

The overall similarities of the two marks weigh against a likelihood of confusion. Private Selection and Preferred Selection have a similar sound, but they have different meanings and dissimilar appearances. With respect to the terms' meanings, Private Selection refers to an exclusive selection, whereas Preferred Selection directly connotes a better quality product. Both terms convey the general idea of a premium product, but they do so through different means. Further, in the Court's view, the marks seen in their context (in either a Kroger or a Lidl store) suggest that they represent a premium store-brand product. This suggestion, combined with the fact that the back of the packages indicate that either Lidl or Kroger distributes the product, cuts against their similarity.

The two marks also vary significantly in appearance, especially when considered in the context seen by the consuming public. Lidl's mark has a highly ornamental border and often appears in color and with the flag of the product's country of origin. Kroger's mark contains only a small flourish in its border and generally appears with light text over a dark background. Lidl's food packages generally contain more vibrant colors than Kroger's packages, which further differentiate the marks when seen in context. For these reasons, the marks' overall dissimilarities weigh against of a likelihood of confusion.

### iii. *Similarities of parties' goods and services, facilities, and advertising*

The parties use the marks at issue on their premium store-brand goods, and this factor weighs in favor of a likelihood of confusion. Next, both parties sell the products at issue in grocery stores, but Lidl's stores differ greatly in both size and appearance from Kroger's Kroger-branded stores, which cuts against a likelihood of confusion. Both stores also advertise in similar ways, which weighs in favor of a likelihood of confusion. Overall, these factors do not hold great weight in the likelihood of confusion analysis.

### iv. *The defendant's intent*

The defendant's intent is "sometimes a major factor in infringement cases." *Pizzeria Uno*, 747 F.2d at 1535. In the case before the Court, Kroger fails to show that Lidl intended to confuse consumers. Kroger points to the proximity of Lidl stores to Kroger stores and to the similarities of the words Private Selection and Preferred Selection as proof of intent, but Lidl offers convincing testimony that it actually seeks to disassociate itself with Kroger and other U.S. supermarkets with its small stores and limited product offerings. Kroger fails to clearly show intent, and this factor weighs against a likelihood of confusion.

## v. *Actual confusion*

Although a plaintiff need not show actual confusion to demonstrate trademark infringement, evidence of actual confusion is "often paramount" in the likelihood-of-confusion analysis. *CareFirst*, 434 F.3d at 268 (citing *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir.2001)). A plaintiff may show actual confusion through anecdotal evidence or by competent survey evidence. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 157 (4th Cir. 2012). Survey evidence showing consumer confusion of "much below 10%" clearly favors the defendant in a trademark infringement case. *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 n.15 (4th Cir. 1996).[4]

Two common methods for surveying consumers for likelihood of confusion are the "Eveready" method and the "Squirt" method. *Valador, Inc. v. HTC Corp.*, No. 1:16-cv-1162, 2017 WL 1037589, at *10 (E.D. Va. Mar. 15, 2017) (citing 6 *McCarthy on Trademarks* § 32:173:50–174). Both methodologies must show the survey taker "the entire mark as used in the marketplace." *Id.* The Eveready format, which Lidl uses here, provides respondents with only the allegedly infringing mark and does not inform them of the asserted mark.[5] The Squirt format, which Kroger uses, presents respondents with both conflicting marks. Kroger's survey shows a 25% rate of confusion while Lidl's survey shows a 2% rate of confusion. Lidl also shows that Kroger's Squirt survey failed to show the trademarks as they appear in the

---

[4] Referring to *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 358 (7th Cir.1983) where the court cited several cases holding that survey evidence indicating ten to twelve percent confusion was sufficient to demonstrate actual confusion, but found that 7.6% confusion weighed against infringement.

[5] The Eveready method is considered "particularly apt where the plaintiff's senior mark is strong and widely-recognized," as it "assumes that they are aware of the mark from their prior experience." *Valador, Inc.*, 2017 WL 1037589, at *10. At the hearing on the preliminary injunction, Professor Cunningham acknowledged that Thomas McCarthy, who wrote the "bible" on trademarks, calls the Eveready survey the "gold standard."

marketplace because (1) it did not show the marks on actual products and (2) showed the logos back to back, without any intervening images or questions, despite the fact that consumers encounter grocery items in competing stores with long lapses in between. Evidence of actual confusion is "often paramount," but Kroger fails to make a clear showing on this factor due to Lidl's competing survey and the potential flaws in Kroger's methodology.

### vi. *The quality of the defendant's products and the sophistication of the consumers*

The final two factors do not weigh one way or another in this case. First, Kroger does not provide information on the actual quality, or lack thereof, of Lidl's Preferred Selection products. Next, consumer sophistication only plays a key role when "the relevant market is not the public at-large." *Sara Lee Corp.*, 81 F.3d at 466. Here, grocery shoppers are representative of the broader public and this factor does not demonstrate a likelihood of confusion.

***

On balance, Kroger fails to make a clear showing that the nine likelihood-of-confusion factors weigh in favor of its success on the merits. Most importantly, Kroger's surveys on secondary meaning and actual confusion suffer from flaws that prevent the Court from finding that Kroger will likely succeed in showing a likelihood of confusion. The surveys' flaws do not render them valueless, but they create some doubt about the strength of the Private Selection mark in the marketplace and about the level of actual confusion among consumers. Only the similarity of the products and the similarity of their advertising weigh in favor of a likelihood of confusion, but these two factors do not tilt the scale in Kroger's favor. On the whole, Kroger's evidence at the preliminary injunction stage fails to make a clear showing of a risk that "an appreciable number" of consumers would be confused by Lidl's Preferred Selection mark.

## B. *Dilution*

"To succeed on a dilution claim, the plaintiff must show that (1) it owns a famous, distinctive mark, (2) the defendant uses an allegedly diluting mark in commerce, (3) an association arose from the similarity of the marks, and (4) the association is likely to impair the distinctiveness of the famous mark." *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 163 (4th Cir. 2014) (citing *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 264-65 (4th Cir. 2007).

Under the first prong, "[a] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Courts consider the following factors, among others, to determine if a mark has the requisite level of recognition: (1) "the duration, extent, and geographic reach of advertising and publicity of the mark"; (2) "the amount, volume, and geographic extent of sales of goods or services offered under the mark"; (3) "the extent of actual recognition of the mark"; and (4) whether the mark was registered. 15 U.S.C. § 1125(c)(2)(A)(i-iv). For a mark to be famous under 15 U.S.C. § 1125, the general public must widely associate the mark with the mark's owner, as opposed to merely associating the mark with any source as under the secondary meaning analysis. Dilution protection is given to marks that are "truly prominent and renowned" and are considered "household names." *Rosetta Stone*, 676 F.3d at 171.

Kroger attempts to use its expert's survey on secondary meaning to establish Private Selection as a famous mark. Forgiving the potential flaws in Professor Cunningham's survey, she admits that the survey shows that only about one-third of consumers who perform at least half of the grocery shopping in their household and who shop at Kroger every one to two months

identify Private Selection with Kroger. Kroger's own survey shows that less than a third of its regular customers associate Private Selection with Kroger. Kroger, therefore, fails to clearly show that Private Selection is so prominent in the American consciousness as to be a household name.

### C. *Other* Winter *Factors*

The remaining *Winter* factors weigh against a preliminary injunction. Kroger has shown only the possibility of consumer confusion and thus only the possibility of irreparable harm—such a showing does not warrant a preliminary injunction. The balance of the hardships also weighs in favor of Lidl. While Kroger has not shown a likelihood of harm, Lidl has only one chance to launch its stores in a new country and would likely suffer if it had to do so without its line of premium products. Finally, the public interest lies in robust competition, and the risk posed to Kroger by Lidl's Preferred Selection mark does not outweigh that interest.

### IV. CONCLUSION

For the reasons stated above, Kroger has not clearly shown that it is likely to succeed on the merits of its claims. Accordingly, the Court denies the motion for preliminary injunction.

An appropriate Order shall issue.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: July 31, 2017
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

13